UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | PRISONER |
| ANDREW OWENS, | : | CASE NO.  3:01CV1480 (SRU) |
| Petitioner | : | |
| | : | |
| V. | : | |
| | : | |
| COMMISSIONER OF CORRECTION, | : | JANUARY 18, 2007 |
| Respondent | : | |
| | : | |

RESPONDENT'S MEMORANDUM OF LAW
IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

This memorandum is submitted in opposition to the application for writ of habeas corpus filed in the above-captioned proceeding.  In this case, the petitioner raises two claims of error.  Specifically, he alleges that (1) he was denied the effective assistance of counsel because his attorney failed to call a particular witness and (2) his attorney labored under a conflict of interest.  For the reasons set forth below, the decision of the state court on the petitioner's claims is not contrary to, or an unreasonable application of, clearly established federal law.  Thus, the petitioner is not entitled to federal habeas corpus relief and his petition must be dismissed.

## I.     PROCEDURAL HISTORY[1]

---

[1]     The procedural history of the petitioner's case, as well as the factual findings of the state courts, are drawn from the following documents which are forwarded to this Court as appendices to the respondent's memorandum of law dated December 4, 2001:

Appendix A   Decision of the Connecticut Appellate Court on direct appeal; *State v. Owens,* 38 Conn. App. 801, 663 A.2d 1094 (1995) *(Owens I)*

Appendix B   Decision of Connecticut Supreme Court denying petition seeking discretionary review of the decision of the Appellate Court; *State v. Owens*, 235 Conn. 912, 665 A.2d 609 (1995).

After a trial to a jury, *Murray, J., presiding,* the petitioner was convicted of manslaughter in the first degree in violation of Connecticut General Statutes § 53a-55(a)(3).[2] On March 24, 1994, the trial court sentenced the petitioner to a term of twenty years incarceration. The petitioner appealed. On August 22, 1995, the Connecticut Appellate Court affirmed the judgment of conviction. *State v. Owens,* 38 Conn. App. 801, 663 A.2d 1094 (1995) (hereinafter *Owens I*). The petitioner then sought discretionary

----

Appendix C    Decision of the state habeas court

Appendix D    Record in petitioner's appeal from the state habeas court's decision

Appendix E    Petitioner's brief on appeal from the state habeas court's decision

Appendix F    Respondent's brief on appeal from the state habeas court's decision

Appendix G    Connecticut Appellate Court's decision in petitioner's appeal from the state habeas court's decision; *Owens v. Commissioner of Correction,* 61 Conn. App. 347, 763 A.2d 1086 (2001) *(Owens II)*

Appendix H    Connecticut Supreme Court's denial of petition for certification for appeal, *Owens v. Commissioner of Correction,* 255 Conn. 944, 769 A.2d 58 (2001)

Appendix I    Transcripts of the proceedings before the state habeas court on October 15, 1998 and January 7, 1999

[2]    General Statutes § 53a-55(a)(30 provides that "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

review by the Connecticut Supreme Court. That court denied such review on September 28, 1995. *State v. Owens,* 235 Conn. 912, 665 A.2d 609 (1995) .

On or about January 14, 1997, the petitioner sought relief in the state habeas court. *See Andrew Owens v. Warden,* Docket No. CV97-0567684, Superior Court in the judicial district of Hartford; Appendix D at 1-2. After a trial on the merits of his claims, the state habeas court denied his petition. The petitioner appealed. On January 9, 2001, the Connecticut Appellate Court dismissed that appeal. *Owens v. Commissioner of Correction,* 61 Conn. App. 347, 763 A.2d 1086 (2001) (hereinafter *Owens II*). The petitioner then sought discretionary review by the Connecticut Supreme Court. *Owens v. Commissioner of Correction,* 255 Conn. 944, 769 A.2d 58 (2001). That court denied such review on February 28, 2001.

Meanwhile, the petitioner filed the instant application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 23, 2001.

## II.    FACTS UNDERLYING THE PETITIONER'S CONVICTION

On direct appeal from his conviction, the Connecticut Appellate Court explained that:

There were five identifications witnesses: Edward Thomas, Lawrence "Bernard" Saunders, Melissa Minnifield, Kaishawda Minnifield, and Shaneeka Counsel. Each witness saw the defendant confront the victim, Ragar J. Overstreet, at 10 Bronson street in Waterbury. The witnesses saw the defendant argue with Overstreet for several minutes and then pull out a gun, shoot Overstreet and leave. Each witness had a considerable amount of time to observe the events associated with the shooting of Overstreet, and the attention of each was directly focused on the argument between the defendant and Overstreet prior to the shooting.

*State v. Owens,* 38 Conn. App. 801, 663 A.2d 1094 (1995).

## III.    ARGUMENT

In this proceeding, the petitioner claims that his custody is unlawful in that (1) he was denied the effective assistance of counsel at his criminal trial because his attorney failed to call a particular witness and (2) his attorney labored under a conflict of interest. For the reasons set forth below, the petitioner cannot demonstrate that the relevant decisions of the state courts on his claims are contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. As a result, his claims are without merit and his petition must be dismissed.

### A.    Standard Of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a writ of habeas corpus "may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).[3] The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta," of the High Court's "decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412, 120 S.Ct. at 1523.

---

[3]    Justice O'Connor delivered the opinion of the Court with respect to Part II in which it determined that the Antiterrorism and Effective Death Penalty Act (AEDPA) modified the role played by federal habeas courts in reviewing petitions filed by state prisoners and interpreted § 2254(d)(1). Justice Stevens delivered the opinion of the Court with respect to Parts I, III, and IV.

A state court decision is "contrary to" clearly established Federal law if it falls within one of two scenarios.  Under the first scenario, a state-court decision will be contrary to "clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."  *Williams*, 529 U.S. at 405, 120 S.Ct. at 1519.  As for the second scenario, the Court explained that a "state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."  *Id.* at 406, 1519-20.

If a state-court decision is not "contrary to" Supreme Court precedent, the federal habeas court must determine whether the state court's decision involved an "unreasonable application" of clearly established Federal law.  In so doing, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Williams*, 529 U.S. at 409, 120 S.Ct. at 1521.  Thus, courts must apply an objective standard.  An "*unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Id.* at 410, 1522.  "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411, 1522.

Once this standard is applied to the claims raised by the instant petitioner, it becomes clear that federal habeas corpus relief is unwarranted and the petition must be dismissed.

**B.     The State Habeas Court's Determination That The Petitioner
        Was Not Denied The Effective Assistance Of Counsel Was Not
        An Unreasonable Application of Clearly Established Federal
        Law**

The petitioner claims that his right to the effective assistance of counsel was

violated.  Specifically, he alleges that:

> Trial counsel failed to investigate or obtain statements from critical witnesses
> or call them to testify at [trial] landlord of building where my sister [allegedly]
> lived or my sister.
>
> There was testimony at trial by "Bernard Sanders" that a week prior to the
> incident he saw me at a Hill Street apartment that my sister [allegedly] lived.
> I told my trial attorney Mr. Isko to find out who owned the building where he
> [allegedly] saw me and to [subpoena] his/her records to show my sister didn't
> live at this address.  He refused, also never took a statement from my sister
> after I requested him to do so various times. . .

Petition [Doc. # 43] at 9.

As demonstrated below, the state court decision on this claim is not contrary to, or

an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States.  As a result, the petitioner is not entitled to federal

habeas corpus relief.

### 1.     Facts pertaining to the claim

Before the state habeas court, the petitioner claimed that his attorney should have

called certain witnesses to dispute one of the eyewitnesses' testimony.  After a trial on the

merits of the petitioner's claim, the state habeas court decided the issue, as follows:

> The petitioner was arrested on a charge of murder in connection with the
> death of Ragar J. Overstreet on August 26, 1992 at 10 Bronson Street in
> Waterbury.  The arrest resulted from the identification of the petitioner by five
> witnesses who saw the petitioner confront the victim at said location, argue
> with him for several minutes and then pull out a gun and shoot the victim.

6

Within hours of the victim's death, the five witnesses viewed an array of photographs at the police station and each separately selected the photograph of the petitioner as the perpetrator.

The petitioner was called as his only witness.  He testified that he had requested two witnesses to be called on his behalf, his sister Angela and her landlord because a witness, who testified as an eyewitness, claimed to have known the petitioner prior to the shooting through his friendship with his sister Angela but had given an address which was not where she lived. . . . He also stated that his defense was that he was not there as his alibi witness, Judy Cromwell, testified and that there was no interaction of Overstreet with his sister which would bear upon the alleged eyewitnesses' claims that the shooter stated Overstreet spat upon his sister Angela.

* * *

Lawrence Bernard Saunders, a nephew of the victim had testified at the criminal trial that he was with his uncle when he was shot by a person whose nickname was Akeem whom he had met during the previous week at the apartment of Akeem's sister Angela.  He identified this person through an array of photographs and at the trial as the petitioner.  He testified that he was a friend of Angela for several years and visited her almost daily.  Angela was not called as a witness in his criminal trial but McKay argued to the jury that it was not proved that the petitioner was even called Akeem nor ever had a sister nor that there was an interaction with the victim by anyone associated with the petitioner, with the obvious attempt to enhance the claim of misidentification of the petitioner by said witness.  Angela was not called as a witness in this hearing.

* * *

A successful petitioner must show that there is reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different.  *Copas v. Commissioner,* 234 Conn. 139, 662 A.2d 718 (1995); *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.  The petitioner has failed to prove counsel's representation fell below an objective standard of reasonableness.  *Aillon v. Meachum,* 211 Conn. 352, 359, 559 A.2d 206. The main thrust at trial was identification. The motion to suppress identification was fully heard by the trial court and the petitioner has brought nothing to this hearing to demonstrate that the trial court's decision to deny the motion was not warranted. The jury had before

7

it the testimony of witnesses who had made identification and the testimony of the petitioner's alibi witness and were in a position to judge the credibility of such witnesses. The petitioner has not demonstrated a constitutional issue of merit.

Appendix C; Appendix D at 24-30.

### 2.    The petitioner did not raise the instant claim in the appellate courts of Connecticut and, therefore, the claim has not been exhausted

While the petitioner raised this claim before the state habeas court, he did not pursue it in his appeal of that court's decision.  Indeed, in his brief to the Connecticut Appellate Court, the petitioner noted that "[t]his appeal is confined to the issues derived from a potential conflict of interest."  Appendix E at 2.  Nowhere in that brief does the petitioner raise this claim or discuss his sister, his sister's landlord, or Bernard Saunders. *See* Appendix E at 1-12.

Federal habeas corpus relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."  28 U.S.C. § 2254(b)(1)(A).  A claim will not be considered "exhausted" unless it has been presented to the highest state court. *Daye v. Attorney General,* 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc).  *See also Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir. 1991) ("a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition").  Indeed, even if a petitioner can demonstrate a "clear violation" of his rights, federal relief is unwarranted unless available state remedies are exhausted.  *Duckworth v. Serrano,* 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981) (per curiam).  This "exhaustion requirement springs primarily from considerations of comity."  *Daye,* 696 F.2d at 191.  It requires that federal courts refrain

8

from exercising "habeas review of a state conviction unless the state courts have had an opportunity to consider and correct any violation of federal law" and, thus, demonstrates "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Id.*

After the state habeas court denied his petition, the petitioner appealed to the Connecticut Appellate Court. Before that court, he claimed that (1) "the habeas court erred in denying the petition for certification,"[4] (2) "the habeas court erred in not finding ineffectiveness due to conflict of interest," and (3) "the failure to engage in waiver colloquy constitutes a violation of due process." Appendix E at i. None of these claims involve counsel's failure to call the petitioner's sister or her landlord for the purpose of impeaching the testimony of Bernard Saunders. Thus, this claim has not been "exhausted" in the state courts.

---

[4]    Connecticut General Statutes § 52-470(b) provides that "*No appeal* from the judgment rendered in a habeas corpus proceeding . . . may be taken unless the appellant . . . petitions the judge before whom the case was tried . . . that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies." (Emphasis added.) Nevertheless, if an individual demonstrates that the denial of certification constitutes an abuse of discretion, an appellate court will entertain his appeal. A "petitioner will establish a clear abuse of discretion in the denial of a timely request for certification to appeal if he can demonstrate the existence of one" of the criteria described in *Lozada v. Deeds,* 498 U.S. 430, 111 S.Ct. 860, 112 L.Ed.2d 956 (1991). *Simms v. Warden,* 230 Conn. 608, 616, 646 A.2d 126 (1994). "A petitioner satisfies that burden by demonstrating: that the issues are debatable among jurists of reason; that a court *could* resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further. . . ." (Citations omitted; emphasis in original; internal quotation marks omitted; brackets omitted.) *Id.* Thus, if a petitioner has been denied certification to appeal *and* he cannot establish that such denial was an abuse of discretion, he is not entitled to appellate review and his appeal will be dismissed.

For this reason alone, the petitioner is not entitled to review or relief upon his unexhausted claim.

> **3.      Because the state habeas court refused to review the petitioner's unexhausted claim, the claim must be considered "procedurally defaulted"**

Earlier in this proceeding, the Court determined that this claim had not been exhausted in the state courts.  *See* Ruling [Doc.  # 32].  Thereafter, the Court dismissed this count and ordered that the petitioner return to state court and attempt to exhaust his state remedies.  *Id.*  The Court stayed proceedings on the second count of the petition.  *Id.*  The petitioner then returned to the state habeas court.  The state habeas court dismissed the claim because the same ground–*i.e.,* ineffective assistance of counsel–had been litigated in a prior state habeas action.   *See* Transcript [Doc. # 36].[5]  The state habeas court's rejection constituted an exercise of its discretion because Connecticut's Practice Book § 23-29(3) provides that the court ***may*** dismiss a "petition or any count thereof" if it "presents the same ground as a prior petition previously denied and fails to state new facts or proffer new evidence not reasonably available at the time of the prior petition."  The fact that the state habeas court rebuffed the petitioner's efforts to exhaust his claim, however, does not render the claim reviewable in federal court.  Rather, because he no longer has any available state remedies, his claim now must be considered exhausted but defaulted.

---

[5]      A reading of the transcript of that proceeding demonstrates that the state habeas court did not understand the federal doctrine of "exhaustion."

An unexhausted claim will be deemed "exhausted" if it is clear that a state court would hold the claim to be procedurally barred. *Grey v. Hoke,* 933 F.2d 117, 120-21 (2nd Cir. 1991). "In such a case, a petitioner no longer has 'remedies available in the courts of the state' within the meaning of 28 U.S.C. § 2254(b)." *Grey*, 933 F.2d at 120. In other words, "[w]hen a claim has never been presented to a state court, a federal court may theoretically find that there is an 'absence of available State corrective process' under § 2254(b)(1)(B)(I) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile. In such a case, the habeas court theoretically has the power to deem the claim exhausted. *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir. 1997)." *Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir. 2001). If a petitioner has "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred", then "there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims." *Coleman*, 501 U.S. at 735 n.1, 111 S.Ct. at 2557 n.1. In other words, the Court may consider the claim to be "exhausted" for federal purposes. If it does so, however, it also must find the claim to be "procedurally defaulted." *Aparicio,* 269 F.3d at 89-92; *Grey,* 933 F.2d at 120-21.

It is well-established that a state prisoner who defaults his federal claim in state court pursuant to an independent and adequate state procedural rule will be denied federal habeas review absent a showing of cause for the default and actual prejudice arising therefrom *or* that the failure to consider the federal claim will result in a fundamental

miscarriage of justice.[6]  *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 1592, 146 L.Ed.2d 518 (2000); *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Harris v. Reed,*  489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed. 308 (1989); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (where state court refused to review the merits of petitioner's claim because he failed to raise the claim at trial as required under state procedure, federal habeas relief was unavailable absent a showing of "cause" and "prejudice").  A habeas petitioner who has failed "to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance"--just as the petitioner who has failed to exhaust his state remedies has done. *Coleman,* 501 U.S. at 731-32, 111 S.Ct. at 2555.  Indeed, the Supreme Court has explained that without this rule, "a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws."[7]  *Id.* at 730-31, 2554.  "State procedural rules 'are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily

---

[6]     The "fundamental miscarriage of justice" exception applies to those cases where "a constitutional violation probably has caused the conviction of one innocent of the crime."  *McCleskey v. Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991); *Smith v. Murray,* 477 U.S. 527, 537, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986); *Murray v. Carrier,* 477 U.S. 478, 495-96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).

[7]     "In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional."  *Coleman,* 501 U.S. at 729, 111 S.Ct. at 2254.

evaded, it undermines the criminal justice system.'" *Lambrix v. Singletary,* 520 U.S. 518, 525, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).

In this case, the petitioner did not present his ineffectiveness claim to the state's appellate courts. Rather, he only presented his conflict-of-interest claim. Thus, the state's appellate courts never had the opportunity to review the merits of the claim. After this Court determined that the claim was not exhausted, the petitioner attempted to return to the state habeas court but was rebuffed. Therefore, his claim now must be deemed procedurally defaulted and relief cannot be obtained unless he can demonstrate good cause for that default and actual prejudice.

For these reasons, the petitioner cannot obtain relief on this claim and it must be denied.

> **4.   Alternatively, the claim may be denied because the petitioner has failed to demonstrate that counsel's performance resulted in prejudice**

Despite the petitioner's failure to exhaust his state remedies with respect to this claim, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Here, even if his claim is reviewed, the petitioner cannot establish that he is entitled to relief.

Under AEDPA, a court begins analyzing a claim "by determining the relevant clearly established law" which is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. . . ." (Citation omitted.) *Yarborough v. Alvarado,* 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938

(2004). Here, the state habeas court appropriately identified the "governing legal principles" and resolved the petitioner's claim in accordance with the Supreme Court's 1984 decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland*, the Court explained that to establish a denial of the right to the effective assistance of counsel, a petitioner must demonstrate: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

In deciding whether a petitioner has satisfied the first prong of *Strickland*, courts must decide whether counsel's performance fell below the reasonable competence exhibited by lawyers with ordinary training and skill in criminal law. In other words, the question is whether counsel's acts or omissions were "outside the wide range of professionally competent assistance" or failed to meet "prevailing professional norms." *Strickland*, 446 U.S. at 690, 104 S.Ct. at 2066. Flawlessness is not required. The right to counsel is the right to effective assistance and not the right to perfect representation.

To satisfy the "prejudice" requirement, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In other words, when a petitioner challenges his conviction on the ground of ineffective assistance of counsel, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

In analyzing a claim of ineffectiveness, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* Here, the petitioner presented no evidence of prejudice. Therefore, it is easier and more appropriate to dispose of his petition by finding that no prejudice resulted from any alleged errors of counsel.

At the criminal trial, five witnesses--Edward Thomas, Lawrence "Bernard" Saunders, Melissa Minnifield, Kaishawda Minnifield, and Shaneeka Counsel—testified that they "saw the defendant confront the victim, Ragar J. Overstreet, at 10 Bronson Street in Waterbury. The witnesses saw the defendant argue with Overstreet for several minutes and then pull out a gun, shoot Overstreet and leave. Each witness had a considerable amount of time to observe the events associated with the shooting of Overstreet, and the attention of each was directly focused on the argument between the defendant and Overstreet prior to the shooting." *Owens I,* 38 Conn. App. at 803. Lawrence "Bernard" Saunders, who was the victim's nephew, testified "that he was with his uncle when he was shot by a person whose nickname was Akeem whom he had met during the previous week at the apartment of Akeem's sister Angela." Appendix D at 27. Saunders further testified that "he was a friend of Angela for several years and visited her almost daily. Angela was not called as a witness . . . but [trial defense counsel] argued to the jury that it was not proved that the petitioner was even called Akeem nor ever had a sister nor that there was interaction with

the victim by anyone associated with the petitioner, with the obvious attempt to enhance the claim of misidentification of the petitioner by said witness." Appendix D at 27-28.

At the state habeas trial, the petitioner explained that he wanted his sister, Angela, and her landlord to testify that she did not reside at the apartment that Saunders identified. He testified that such evidence would impeach Saunders, as follows:

> Q.    During your trial, can you relate any of the conversations that you would of had with Mr. Isko bearing on his investigation of your case?
>
> A.    Yes. I had asked him to call several witnesses on my behalf. He said that he was looking into it, and investigator, the guy's name was Vinney Paralieno (phonetic). I am not sure. It's been a long time.
>
> Q.    Okay. And who were those witnesses, sir?
>
> A.    One was my sister, Angela Davis, and another one was the landlord in the place which she resided. There was a question that as to one witness telephoned that allegedly saw me at a location prior to the incident. And I related it to Mr. Isko that my sister didn't reside at this location and if he could contact the landlord, he can verify and substantiate that.
>
> Q.    And what did Mr. Isko respond regarding these witnesses?
>
>                              * * *
>
> A.    He, basically, I think he said he would have someone look into it and then I think he just never got back to me about it. I mean, I pressed him a few times but I asked him, I never heard anything else about it.

Appendix I; Transcript (10/15/98) at 4-5.

> Q.    At what time did you ask Mr. Isko then to have your sister come in?

16

A.    From the first day I talked to him after I was arraigned from, I believe, the lower court when they told me he was my attorney.

Q.    Okay.

A.    He told me what the state was alleging.  I told him that wasn't true and I gave him, he asked for my sister's phone number and he asked from my older sister's phone number.  She was responsible for paying my baby sister's rent.

Q.    Okay.  Now, what information did you feel Angela Davis had to provide to Mr. Isko?

A.    Well, the date of the allege incident had happened, because Mr. Overstreet had spat on my baby sister's face and I told Mr. Isko that he should have sent an investigator to talk to my sister to verify the fact that she didn't know Mr. Overstreet, she never had any type of connection with him.

Q.    So that was the only information that Miss Davis could probably provide?  In other words, she was not an eye-witness to the incident.  Correct?

A.    I wouldn't know exactly what other information that she could provide that's why I sent him and asked him to send an investigator to speak to her.

Appendix I; Transcript (10/15/98) at 12-13.

Finally, the petitioner discussed the state's theory that the petitioner's motive for

shooting Overstreet was that Overstreet had spit on the petitioner's sister.

THE COURT:    Was your sister able to testify concerning anything other than the alleged claim what was the alleged claim of your sister being spat upon by–

[THE PETITIONER]:    Yes.

THE COURT:    –Mr. Overstreet?

[THE PETITIONER]:     Yes.

THE COURT:     Was that reference in evidence?

[THE PETITIONER]:     Yes.  In fact I believe that was the state's motive.

THE COURT:     It was presented into evidence?

[THE PETITIONER]:     Yes.

THE COURT:     And was your sister in a position to testify concerning anything about any other matter than that?

[THE PETITIONER]:     I can't speak for her.

THE COURT:     But you must have talked to her.

[THE PETITIONER]:     I haven't had contact with her.

THE COURT:     But you told your attorney that she could testify on your behalf.

[THE PETITIONER]:     I told my attorney that that she would substantiate the fact that she didn't have a problem with that Overstreet guy.  That was conveyed through one of the witnesses.  My older sister who spoke to my baby sister--

THE COURT:     That was basically the only evidence that she would have been able to present as far as–

[THE PETITIONER]:     As far as, you know, I don't know what she would have said one way or the other.

THE COURT:     You mentioned your landlord–

[THE PETITIONER]:     He's not my landlord.  The statement came in I believe the witness before had seen me at sister's house and according to my other sister had brought it to my attention that at this particular time, my sister wasn't living there. So I conveyed it to Mr. Isko, told him perhaps he should subpoena the landlord because the landlord

18

would have records, checks, receipts to substantiate the fact that what the witness was referring to wasn't accurate.

THE COURT:    Wasn't true?

[THE PETITIONER]:    Exactly.

* * *

THE COURT:    Well, on the fact that the motive for your accosting Mr. Overstreet was because he spat upon your sister.

[THE PETITIONER]:    Right.

THE COURT:    And that was apparently the motive that you felt that the state was presenting for your accosting Mr. Overstreet.

[THE PETITIONER]:    I think that's the evidence that came in at trial.

THE COURT:    And it was your feeling that your sister should be called because you learned from your older sister that didn't occur.

[THE PETITIONER]:    Exactly.

Appendix I; Transcript (10/15/98) at 17-19.

The state habeas court only heard testimony from the petitioner and his attorney, Michael Isko.  Isko was not questioned about Angela Davis or her landlord.  Neither Davis nor her landlord testified before the state habeas court.  Thus, that court had no evidence upon which it could determine what either witness would have said if called to testify.  In other words, no evidence was presented from which the court could find prejudice.  Normally, courts "expect that such information would be presented to the habeas court through the testimony of the potential witnesses. . . . Therefore, if the potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to

demonstrate, with some precision, the content of the testimony they would have given at trial." *Cross v. O'Leary*, 896 F.2d 1099, 1100 (7th Cir.), *cert. denied sub nom. Cross v. Illinois*, 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990), *quoting United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987); *United States v. DeBango,* 780 F.2d 81, 86 (D.C. Cir. 1986) (absent evidence of what the missing witness "would have said had trial counsel located him," defendant lacks support for his assertion that he "was prejudiced by counsel's failure to locate" the witness).

Given the lack of evidence about the potential testimony, the petitioner cannot prevail under *either* prong of *Strickland*. He has not shown that his sister's testimony would have been favorable. Absent a showing that her testimony would have been helpful, counsel's mere failure to call a potential witness cannot be deficient performance. Likewise, because there has been no showing that the sister's testimony would have been exculpatory–and because the state had four other eyewitnesses--the petitioner cannot demonstrate that counsel's failure to call her as a witness resulted in prejudice. As a result, the decision of the state habeas court cannot be an unreasonable application of *Strickland* and relief must be denied.

### C.    The State Habeas Court's Determination That The Petitioner's Attorney Did Not Labor Under A Conflict Of Interest Was Not An Unreasonable Application of Clearly Established Federal Law

The petitioner claims that one of his two attorneys, Assistant Public Defender Michael Isko, labored under a conflict of interest. Specifically, he asserts that:

> My trial attorney Mr. [Michael] Isko had previously represented the victim in the instant matter. I asked him to withdraw he refused, and also stay on said case on appeal.

20

> In September 1993 I had found out that my trial attorney had previously represented the deceased in the instant matter, I wrote him a letter requesting him to withdraw because I did not know what type of relationship he shared with the deceased family, not court I inquire because attorney client relationship had been established and attorney client confidentiality forbid me, see his response attached.

Petition [Doc. # 43] at 11.

As demonstrated below, the decisions of the state courts are not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

### 1.    Facts pertaining to the claim

Before the state habeas court, the petitioner raised a claim that one of his two attorneys labored under a conflict of interest because the lawyer had previously represented the victim in an unrelated matter. The evidence presented to the state habeas court demonstrated that the petitioner shot and killed Ragar J. Overstreet at 10 Bronson Street in Waterbury on August 26, 1992. While awaiting trial on the murder charge, the the petitioner learned that his lawyer, Attorney Michael Isko, had represented the victim, Ragar Overstreet. The petitioner conveyed that information to his counsel and Attorney Isko replied in a letter dated September 27, 1993. There, Isko explained the following.

> My representation of Ragar Overstreet was very brief, and one of thousands of cases I handled in a busy G.A. court.
>
> I checked my file and there is no confidential information in it that I can use to your advantage, and my association with him was so brief that I have no allegiances or connections that can be recognized as a conflict. Indeed, I have no specific memory of him. I am intent on providing you with an aggressive and comprehensive defense.

Appendix E at A-1; Appendix F at A-2.

The subject arose again on December 1, 1993.  At that time, Attorney Isko notified the trial court that an issue regarding a potential conflict had arisen.  He noted that (1) he had represented the victim "a number of years ago"; (2) the representation was brief; (3) no presentence investigation report (PSI) was ordered in the victim's case; and (4) he received no information "that is relevant to this trial . . . that can be of use in this trial."  Appendix F at A-5.  The trial court asked Attorney Isko whether he had discussed the matter with the petitioner.  *Id.* at A-6.  Isko indicated that he had done so and that the petitioner desired Isko's continuing representation, as follows:

> THE COURT:        All right.  And you've discussed this with your client?
>
> MR. ISKO:    Fully, Your Honor.
>
> THE COURT:        And after the discussions he wishes you to continue to represent him?
>
> MR. ISKO:    That is correct, Your Honor.
>
> THE COURT:        I rely upon you as an officer of the Court to have thoroughly researched the matter and to have made the necessary disclosures to him and to assist the Court in preserving the trial free of any conflict.
>
> MR. ISKO:    By both letter and by a visit to Somers Prison, Your Honor, we specifically discussed this issue.
>
>                                                   * * *
>
> THE COURT:        Again, I will reiterate what I've already said. I rely upon you, as an officer of the court, to preserve the trial from any professional conflicts.
>
> MR. ISKO:    I understand, Your Honor.

22

THE COURT:        As you present both situations I can't imagine
a conflict, but you know the situations better that I do.[8]

Appendix F at A-6, A-8.

At the 1998 state habeas trial, the petitioner testified that he learned that the victim

had been represented at one time by Attorney Isko.  Transcript (10/15/98) at 7.[9]  He then

wrote Isko a letter.  Transcript (10/15/98) at 6.  The petitioner asserted that he told Isko

"that I didn't feel comfortable with him representing me due to the fact that he had

represented Mr. Overstreet before.  And several occasions there we had heated

conversations in regard to his trial strategy and it sort of, it appear to me as if, that he was

somewhat empathetic toward the family which is all likelihood expected but he was my

attorney."  Appendix I; Transcript (10/15/98) at 6.  The petitioner continued, "he was

representing me and concerns that I had about it.  There was strong concerns I didn't feel

comfortable with him representing me."  *Id.* at 6-7.  He then stated that he asked Isko to

withdraw.  *Id.* at 9.  The reason he gave, however, had nothing to do with an alleged

conflict.  Rather, he wanted Isko to withdraw because he felt Isko was too inexperienced.

*Id.* at 8-9.

Attorney Isko testified that he represented the victim in "some sort of stolen car

[matter] that was subbed down to a misdemeanor use without the owner's permission.

There was no investigation done.  There was no P.S.I. done.  There was no programs filed.

There was no real information about Mr. Overstreet in the file."  Appendix I; Transcript

---

[8]        At this time, the petitioner had another pending state criminal proceeding.

[9]        The transcripts of the state habeas trial are forwarded to this Court as
Appendix I to the respondent's Memorandum of Law dated December 4, 2001.

23

(1/7/99) at 6.  No connection existed between the victim's criminal matter and the murder for which the petitioner was charged.  *Id.* at 7.  Although he reviewed the victim's file, Isko found nothing "that would prevent me from putting on Mr. Owens' case.  So Mr. Owens would not be harmed from whatever obligation I had to [the victim]."  *Id.* at 7.  Attorney Isko also noted that he examined the relevant rules of professional conduct when the issue came to his attention.  *Id.* at 9.  Isko testified that he discussed the matter with the petitioner on October 5, 1993.  *Id.* at 9.  Finally, Isko explained that Attorney James McKay also represented the petitioner.  He testified that McKay was "senior counsel from our capital unit" who "had been a public defender in St. Louis.  He had experience in forty trials, most of them very serious felonies."  *Id.* at 5, 18.

> Having heard all the evidence, the state habeas court determined that:
>
> The petitioner was called as his only witness. . . .  He . . . testified that he requested Isko to withdraw from his case because Isko had at one time represented the victim which the petitioner claimed to have been a conflict in his representation of him and he produced a letter from Isko to him dated September 27, 1993, *Petitioner's Exhibit 15*.  He claimed that even though Attorney McKay was listed as his co-counsel that he was only there for the start of trial and did not participate much because of counsels' differences as to trial strategy.
>
> * * *
>
> Attorney Isko was called by the respondent and testified that the petitioner's case was his first murder trial and that McKay was assigned as co-counsel. He recalled receiving a communication from the petitioner concerning his representation of the victim early in September 1993 and looked up the records.  He determined that he was assigned to Overstreet on a charge of larceny and that very day Overstreet decided to plead to the charge and be sentenced without the reference for a PSI.  Overstreet did not communicate any confidential matters to him and it ended up as a one-day contact.  He felt that he had no basis for moving to withdraw and communicated that to the petitioner. *Petitioner's Exhibit 15*.  Prior to the start of trial Isko made known

24

to the trial judge in a chambers conference the Overstreet representation which was then placed on record. See *Respondent's Exhibit B.*

The court finds that the petitioner is a poor recorder of history. His attorney, McKay, did participate throughout the entire trial, questioning witnesses during the evidentiary portion of the motion to suppress identification, *Petitioner's Exhibit 3,* as well as during the trial, *Petitioner's Exhibits 5 and 7 and 9,* and gave the closing argument for the defense, *Petitioner's Exhibit 9,* and was present during the deliberation of the jury and the rendering of its verdict. *Petitioner's Exhibits 10-13.*

* * *

As to the claim of the petitioner that Isko, by having represented the victim resulting in a conflict of interests, the petitioner has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance. *Phillips v. Warden,* 220 Conn. 112, 133, 595 A.2d 1356. The inquiry is done on the facts of the particular case. *Id.*, 134, 595 A.2d 1356. His claim is that single one day representation had caused him to show sympathy for the victim which deprived the petitioner of conflict-free representation. His cross-examination of family members and his argument in claim of the motion to suppress identification evidenced no such sympathy. See *Petitioner's Exhibit 3.* In that the past criminal offense of Overstreet was unrelated to the offense here, no confidential communication having been made and Overstreet was dead, there appeared no potential interest would arise adverse to the interests of the petitioner represented by Isko. *State v. Jennings,* 216 Conn. 647, 655, 583 A.2d 915. Where neither an actual nor potential conflict of interest exists, it is unnecessary for the court to inquire further or to obtain a waiver from the defendant. *State v. Cruz,* 41 Conn. App. 809, 816, 678 A.2d 506.

Appendix D at 25-29.

Thereafter, the petitioner challenged the state habeas court's decision. The

Connecticut Appellate Court explained that:

The court analyzed the petitioner's conflict of interest claim according to the test articulated in *Phillips v. Warden,* 220 Conn. 112, 133, 595 A.2d 1356 (1991). The test requires the petitioner to establish "(1) that counsel actively

represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) *Id.* "[A] court judging a claim of ineffective assistance of counsel must do so on the facts of the particular case, viewed as of the time of counsel's conduct." (Internal quotation marks omitted.) *Id.* at 134, 595 A.2d 1356. The habeas court determined that there was no conflicting interest adversely affecting the petitioner's interests.

*Owens II*, 61 Conn. App. at 349.

> ## 2.   The mere fact that one of the petitioner's two attorneys represented the dead victim for one day did not create a conflict of interest

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). "[T]he *possibility* of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an *actual* conflict of interest adversely affected his lawyer's performance. . . . But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." (Emphasis added.) *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). If a petitioner can demonstrate that his attorney was burdened by an actual conflict of interest that adversely affected the lawyer's performance, he need not prove that such conflict prejudiced him. Rather, prejudice will be presumed. *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). When addressing conflicts of interest, the Supreme Court usually does so in the context of simultaneous, multiple representation. *See Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333

(1980) (counsel represented three codefendants charged with murder); *Holloway v. Arkansas,* 435 U.S. 475. 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (counsel objected to representing the conflicting interests of three codefendants).

The instant case does not involve multiple representation. Rather, the petitioner challenges counsel's *prior*, brief representation of Ragar J. Overstreet, the deceased victim. Prior to the commencement of the petitioner's 1994 criminal trial, one of his two attorneys brought the issue of the possible conflict to the trial court's attention. Attorney Michael Isko explained that he had briefly represented the victim several years earlier. Appendix F at A-5. He revealed that the representation was very brief and that he did not learn anything relevant to the petitioner's case. *Id.* He further stated that he had "no allegiances" to Overstreet. *Id.* "When a considered representation regarding a conflict in clients' interests comes from an officer of the court, it should be given the weight commensurate with the grave penalties risked for misrepresentation." *Holloway*, 435 U.S. at 486 n.9. Indeed, the trial court reinforced counsel's obligations when it twice reminded Attorney Isko of his obligations as "an officer of the court." Appendix F at A-6, A-8. Finally, the trial court observed that "I can't imagine a conflict, but you know the situations better than I do." Appendix F at A-8.

The factual circumstances presented in the instant case most closely resemble those found in *Mickens v. Taylor,* 535 U.S. 162, 174, 122 S.Ct. 1237, 1245, 152 L.Ed.2d 291 (2002). In *Mickens*, a death penalty case, the Court was presented with a fact pattern in which the defendant's lead counsel had briefly represented the deceased victim in a juvenile matter. Like the instant case, the issue did *not* concern multiple, concurrent

representation.  Rather, the Court was presented with a situation concerning the possibility

of a conflict arising from counsel's representation of a former client.  The issue addressed

by the Supreme Court in *Mickens* concerned the trial court's failure to inquire into a

potential conflict.  Thus, the Court's holding in *Mickens* is not relevant to the instant case.

In the underlying decision, however, the U.S. Court of Appeals for the Fourth Circuit

determined that no adverse effect resulted from the prior representation and, therefore,

that the petitioner failed to demonstrate an actual conflict.  In so doing, the court noted that

a "defendant has established an adverse effect if he proves that his attorney took action

on behalf of one client that was necessarily adverse to the defense of another or failed to

take action on behalf of one because it would adversely affect another. . . ."  (Citation

omitted.)  *Mickens v. Taylor,* 240 F.3d 348, 360 (4th Cir. 2001).

        In the instant case, the petitioner has not demonstrated (1) that counsel actively

represented conflicting interests *or* (2) that the alleged conflict adversely affected his

lawyer's performance.   In his brief to the Connecticut Appellate Court, the petitioner

appeared to promise that he could "point to a specific instance in which impairment or

compromise of his interests may be realized."  Appendix E at 5.  A review of his arguments,

however, reveals that such promise was never fulfilled.  Indeed, the petitioner did not even

offer speculation on the issue.  *See* Appendix E at 5-12.  Interestingly, for all his concern

over counsel's alleged sympathy for the victim's family, the petitioner ignores the fact that

his attorneys obtained an *acquittal* on the charge of murder which carries a minimum,

nonsuspendable sentence of twenty-five years.[10]  Rather, the petitioner was convicted of

---

        [10]     The petitioner was charged with murder in violation of General Statutes
§ 53a-54a.  General Statutes § 53a-35a(2) sets the penalty for murder at "not less than

manslaughter in the first degree in violation of General Statutes § 53a-55(a)(3) and was sentenced to twenty years incarceration.

As a result, the petitioner cannot prevail on his claim. No actual conflict of interest existed. Counsel did not actively represent conflicting interests and the alleged conflict did not adversely affect his performance. *See, e.g., Strouse v. Leonard,* 928 F.2d 548, 552-53 (2d Cir. 1991) (no conflict of interest where defense counsel had drafted victim's will and handled real estate and divorce matters for the victim);[11] and *Crisp v. Duckworth,* 743 F.2d 580, 587-88 (7th Cir. 1984) (fact that counsel had represented murder victim in a minor criminal matter did not create a conflict of interest). Thus, the decisions of the state courts are not contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. As a result, the petitioner's claim must fail.

## IV. CONCLUSION

For the reasons set forth above, the respondent respectfully requests that this Court deny the petitioner's claims and dismiss the § 2254 petition attacking the petitioner's state conviction.

---

twenty-five years nor more than life." No portion of this mandatory minimum sentence of twenty-five years may be suspended. *State v. Lopez,* 197 Conn. 337, 356-57, 497 A.2d 390 (1985).

[11]    In *Strause,* the defendant raised two claims that his counsel labored under a conflict of interest. The court found no merit in the first claim, which was based on counsel's prior representation of the victim. The second claim, however, was not so easily rejected. There, the petitioner alleged that his counsel labored under a conflict because he hoped to replace the defendant as the executor of the victim's estate upon the defendant's conviction. As executor, he would be entitled to compensation. The court determined that an evidentiary hearing was required before this claim could be resolved.

Respectfully submitted,

RESPONDENT–COMMISSIONER OF CORRECTION


By: _____/s/_____
    JO ANNE SULIK
    Senior Assistant State's Attorney
    Civil Litigation Bureau
    Office of the Chief State's Attorney
    300 Corporate Place
    Rocky Hill, Connecticut 06067
    (860) 258-5887
    (860) 258-5968 (facsimile)
    E-mail: JoAnne.Sulik@po.state.ct.us
    Fed. Bar. No. ct 15122


## CERTIFICATION

I hereby certify that a copy of this memorandum was mailed to Andrew Owens, Inmate No. 124712, MacDougall Correctional Institution, 1153 East Street South, Suffield, Connecticut 06080, on January 18, 2007.


_____/s/_____
JO ANNE SULIK
Senior Assistant State's Attorney

30